# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

NICHOLAS INGIANNI,

                         Plaintiff,

        v.                                8:13-CV-13
                                                (MAD/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                        Defendant.

MARK A. SCHNEIDER, ESQ., for Plaintiff
KATRINA M. LEDERER, Special Asst. U.S. Attorney, for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the Honorable Mae A. D'Agostino, United States District Judge, pursuant to 28 U.S.C. § 636 (b) and Local Rule 72.3(d). This case has proceeded in accordance with General Order 18.

## I.    PROCEDURAL HISTORY

On April 23, 2010, plaintiff filed an application for Disability Insurance Benefits ("DIB") and an application for Supplemental Security Income ("SSI"), claiming disability beginning on June 30, 2008. (Administrative Transcript ("T") 206-209, 210-15). The applications were denied initially, and plaintiff requested a hearing. (T. 91-92, 138-39). The hearing was held on March 29, 2011, before Administrative Law Judge ("ALJ") Dale Black-Pennington. (T. 26-53). On May 11, 2011, ALJ Black-Pennington issued a decision denying benefits. (T. 96-106). Plaintiff appealed the ALJ's decision, and on July 25, 2011, the Appeals Council ("AC") reversed the ALJ's decision and remanded the case to ALJ Black-Pennington for a new hearing. (T.

112-14).

ALJ Black-Pennington held the new hearing on November 11, 2011, and on January 4, 2012, issued the current decision, again denying plaintiff's benefits. (T. 54-90, 9-23). The ALJ's decision became the final decision of the Commissioner when the AC denied plaintiff's request for review of ALJ Black-Pennington's January 4, 2012 decision. (T. 1-6).

## II. ISSUES IN CONTENTION

The plaintiff makes the following claims:

(1)     The ALJ violated the remand order by failing to fully evaluate the effect of plaintiff's extreme obesity in combination with his other impairments. (Pl.'s Br. at 15-18) (Dkt. No. 12).

(2)     The ALJ violated the remand order by failing to accurately evaluate the limitations caused by plaintiff's mental illness and headaches in her Residual Functional Capacity ("RFC") determination. (Pl.'s Br. at 18-27).

(3)     The ALJ erred in her credibility determination. (Pl.'s Br. at 27-30).

(4)     The ALJ failed to give appropriate weight to treating sources. (Pl.'s Br. at 30-35).

Defendant argues that the Commissioner's decision is supported by substantial evidence and should be affirmed, dismissing the complaint. (Dkt. No. 13). For the following reasons, this court finds that the Commissioner's decision is supported by substantial evidence and will recommend dismissing the complaint in its entirety.

## III. APPLICABLE LAW

### A.     Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or

SSI disability benefits must establish that he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him [per se] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian v. Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697

F3d 145, 151 (2d Cir. 2012)); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents him from performing his past work, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's residual functional capacity"); *Selian*, 708 F.3d at 418 & n.2.

**B. Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d at 417 (quoting *Talavera v. Astrue*, 697 F.3d at 151; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Talavera*, 697 F.3d at 151 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* This standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

In order to determine whether an ALJ's findings are supported by substantial evidence, the reviewing court must consider the whole record, examining the evidence from both sides, "'because an analysis of the substantiality of the evidence must also

include that which detracts from its weight.'" *Petrie v. Astrue*, 412 F. App'x 401, 403-404 (2d Cir. 2011) (quoting *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support of the ALJ's decision. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (citing *Williams*, *supra*).

## IV.   FACTS

The ALJ's 2012 decision sets forth findings of fact and conclusions of law. (T. 14-18). Defense counsel has adopted the ALJ's recitation of the facts. (Def.s' Br. at 1). The court will adopt the facts as stated by the ALJ in her January 4, 2012 decision, with additions or changes as noted in the discussion below.

## V.   THE ALJ'S FIRST DECISION

In the ALJ's first decision, she found that plaintiff had three severe impairments at Step 2 of the disability evaluation: bipolar disorder, anxiety, and headaches. (T. 98). ALJ Black-Pennington found that none of the plaintiff's severe impairments met the requirements of a Listed Impairment under Step 3 of the sequential evaluation. At Step 4, the ALJ found that plaintiff had the RFC to perform a full range of work at all exertional levels, but was only able to understand, remember and carry out simple tasks and would be able to understand, remember and carry out complex tasks with supervision. (T. 100-104). Plaintiff would be able to sustain attention and concentration; maintain socially appropriate behavior; respond to, and relate adequately with others; and would be able to adapt to changes in the work setting.

5

(*Id.*)

Based upon this RFC, the ALJ found that plaintiff was capable of performing his past relevant work as a certified nurse's assistant. (T. 104-106). In the alternative, the ALJ found that plaintiff could perform other work in the national economy in addition to his past relevant work. (T. 105-106). The ALJ used the Medical Vocational Guidelines[1] ("the Grid") as a framework and determined that plaintiff's non-exertional limitations would have "little or no effect on the occupational base of unskilled work at all exertional levels." (T. 106).

## VI.   THE AC REMAND

On appeal, the AC granted plaintiff's request for review, vacated the ALJ's first decision and remanded for the following:

> (1)    an evaluation of the plaintiff's obesity and its effect upon his ability to perform "routine movement and necessary physical activity within the work environment;"
>
> (2)    further consideration of plaintiff's maximum RFC, providing the appropriate rationale with specific reference to the record evidence in support of the assessed limitations in accordance with 20 C.F.R. §§ 404.1545 and 416.945 and Social Security Rulings ("SSR") 85-16 and 96-8p;
>
> (3)    to obtain evidence from a vocational expert ("VE") to clarify the effect of the assessed limitations on the plaintiff's occupational base in accordance with SSR 83-14, including asking the VE appropriate hypothetical questions, reflecting plaintiff's specific

---

[1] 20 C.F.R. Pt. 404, Subpt. P, App. 2.

limitations as established by the record as a whole.

(T. 113). In issuing the above order, the AC determined that the ALJ's decision did not contain an evaluation of the plaintiff's obesity as required under SSR 02-1p, discussing the effect that obesity has, alone or in combination with other impairments, on plaintiff's ability to perform routine movement and necessary physical activity within the work environment. (T. 112). The AC was also concerned that the ALJ's finding that plaintiff could perform his previous work was flawed because his previous work as a nurse's assistant required a specific vocational preparation ("SVP") of 4, but the ALJ found that plaintiff needed supervision for tasks that were not considered "simple."

## VII.   THE ALJ'S NEW DECISION

On remand, the ALJ afforded plaintiff a second hearing, at which plaintiff and VE David Sypher testified. This time, the ALJ found only two severe impairments, the bipolar disorder and anxiety disorder. (T. 14). The ALJ found that although plaintiff is obese, suffers from recurrent headaches, has a history of hernia, and complained at the hearing of leg pain and "difficulty getting around," these impairments were "not severe." (T. 14-15). The ALJ noted that two of plaintiff's treating sources, Harry Hill, NNP and Amar Munsiff, M.D. did not feel that plaintiff had any severe impairments "at all." (T. 15).

The ALJ then found that plaintiff did not have any Listed Impairments under Step 3. In doing so, the ALJ considered Listing 12.04 (affective disorders) and 12.06 (anxiety-related disorders). (T. 15). At Step 4, the ALJ still found that the plaintiff

had the RFC to perform a full range of work at all exertional levels and is able to understand and follow simple directions and instructions, perform simple tasks, perform complex tasks with supervision, sustain attention and concentration, respond and adequately relate with others, and adapt to changes in the environment. (T. 16).

The ALJ found that plaintiff's mental health impairments were very responsive to medication and quoted Harry Hill, NPP, one of plaintiff's treating nurse practitioners, who stated that the plaintiff "clearly states that the addition of Depakote to his medications has helped him with his symptoms." (T. 17). The ALJ noted that although plaintiff's experienced worsening symptoms in October of 2011, he had been without his medications for two weeks at the time of the examination. (*Id.*) The ALJ also found it significant that two of plaintiff's health care providers refused to "complete" the disability paperwork because they believed that plaintiff was capable of working. (T. 17-18). In April of 2010, treating physician Amar Munsiff, M.D. stated that he found no "significant reason for [plaintiff] not to be employed . . . ." Dr. Munsiff found that despite plaintiff's mental illness, obesity, and headaches, he "seems to be quite functional and attentive." (T. 18).

The ALJ noted that plaintiff had various types of past relevant work. (T. 18). This work included the nurse's aide position, sorter, construction worker, and groundskeeper. Based upon the VE's testimony, the ALJ found that plaintiff could perform his past relevant work of sorter, construction worker, or groundskeeper. (*Id.*) The nurse's aide position was not included as a job that plaintiff could still perform. However, because plaintiff had multiple prior occupations, the ALJ still found that

plaintiff could perform his past relevant work and was not disabled. (*Id.*)

## VIII. <u>SEVERITY/COMBINATION OF IMPAIRMENTS (OBESITY/HERNIA)</u>

### A. **Legal Standards**

Obesity is not in and of itself a "disability," but the Social Security Administration considers it to be a medically determinable impairment, the effects of which should be considered at the various steps of the evaluation process, including steps three and four. SSR 02-1p: "Titles II and XVI: Evaluation of Obesity," 2002 WL 31026506, 67 Fed. Reg. 57859, 57861 (Sept. 12, 2002).[2] "[W]hen determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity." 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.00(Q).

Notwithstanding the requirements of SSR 02-1p, "there is no obligation on an ALJ to single out a claimant's obesity for discussion in all cases." *Cruz v. Barnhart*, 04 CIV 9011, 2006 WL 1228581, at *9 (S.D.N.Y. May 8, 2006); *Mancuso v. Astrue*, No. 1:06-CV-930 (GLS), 2008 WL 656679, at *5-6 (N.D.N.Y. Mar. 6, 2008) (the ALJ did not err by failing to specifically address whether plaintiff's obesity was a severe impairment), *aff'd*, 361 F. App'x 176, 178 (2d Cir. 2010). Furthermore, the ALJ may

---

[2] SSR 02-1p recognizes three levels of "obesity," based on Body Mass Index ("BMI"), which is a ratio of an individual's weight in kilograms to the square of his or her height in meters (kg/m 2). Fed. Reg. at 57860. Level I includes BMIs of 30.0-34.9. Level II includes BMIs of 35.0-39.9. Level III, termed "extreme" obesity and representing the greatest risk for developing obesity-related impairments, includes BMIs greater than or equal to 40. *Id.*

implicitly consider plaintiff's obesity in doing his listing and RFC analysis by relying on medical opinions which, although not specifically referencing limitations due to obesity, make overall assessments of plaintiff's limitation with clear awareness of his weight. *See, e.g., Paulino v. Astrue*, 08 Civ. 02813, 2010 WL 3001752, at *18-19 (S.D.N.Y. July 30, 2010) (although the ALJ failed to mention plaintiff's obesity when conducting step-three listing analysis, he satisfactorily considered the effects of plaintiff's obesity by relying on evaluations by doctors who accounted for the claimant's obesity) (collecting cases); *Drake v. Astrue*, 443 F. App'x 653, 657 (2d Cir. 2011) (the ALJ implicitly factored plaintiff's obesity into his RFC determination by relying on medical reports that repeatedly noted plaintiff's obesity and provided an overall assessment of her work-related limitations).

### B. Application

In this case, the AC remanded plaintiff's application to the ALJ, in part, to "evaluate the claimant's obesity in accordance with Social Security Ruling 02-1p." (T. 113). In her first decision, the ALJ never even mentioned plaintiff's obesity. (T. 96-106). In her second opinion, the ALJ evaluated plaintiff's obesity and found that the impairment was not "severe" at Step 2, along with plaintiff's headaches and history of hernia. (T. 15). The ALJ found that these impairments did not cause more than minimal work-related limitations. (T. 14-15). By making this finding, the ALJ did exactly what the AC ordered. The ALJ determined that the plaintiff's obesity would not have more than a minimal impact upon his work-related functions.

The ALJ's determination is supported by substantial evidence. A review of the

medical records shows that many of them refer to plaintiff's "obesity," the fact that his obesity may be related to the medications that he takes for his mental impairment, and indicate that plaintiff should attempt to lose weight. However, there is not one record that comments upon any effect that plaintiff's obesity might have on his ability to function. On March 8, 2011, Nurse Practitioner ("NP"), Laura Rizzo stated that plaintiff was working on diet and exercise, "without much success," but he also admitted to "diet indiscretions." (T. 579). However, on August 15, 2011, NP Nancy Scanlan stated that plaintiff had lost 23 pounds since June. (T. 621). Plaintiff told NP Scanlan that he lost weight by increasing his physical activity and decreasing his food intake.[3] (T. 621). On August 31, 2011, plaintiff told NP Rizzo that he was walking two miles every other day for his weight. (T. 639).

Plaintiff argues that his obesity should be considered in combination with his other impairments. While it is true that impairments must be considered "in combination,"[4] the ALJ implicitly did so by considering medical opinions regarding plaintiff's overall limitations by practitioners who were clearly aware of his obesity. Moreover, plaintiff did not have any other diagnosed musculoskeletal impairments with which to combine the obesity. The first time that any musculoskeletal problems were mentioned was on September 6, 2011, when plaintiff told PA Linda Hunter that

---

[3] In fact, NP Scanlan's June 6, 2011 report states in the "Plan for care and/or homework" section, that plaintiff should "[i]ncrease physical activity and decrease soda intake." (T. 624). Apparently, plaintiff took NP Scanlan's advice and lost 23 pounds in two months.

[4] See 20 C.F.R. §§ 404.1523; 416.923 (Commissioner will consider the "combined effect" of all impairments without regard to whether any such impairment would be of disabling severity by itself).

11

"'something is going on with my legs.'" (T. 640). PA Hunter stated that the plaintiff

was reporting "bilateral leg aching x 6 months." (T. 640). Plaintiff stated that he did

not know if it was arthritis, but he was "getting leg cramps from his ankles to his

knees." (*Id.*)

Plaintiff told PA Hunter that he had a history of body building with knee squats

with weights, and that he was walking "regularly" but that he had been "doing that for

three years." Plaintiff described the pain as a "muscle ache" and "intermittent

depending on his activity." (*Id.*) He also stated that the discomfort was worse in the

morning or if he had been sitting for a half hour or an hour and then got up. He would

be "stiff and aching until he [got] going." Finally, he explained to NP Hunter that he

felt badly that his weight had ballooned since being on all the medications, "but that is

why he does the walking 2 miles every other day." (*Id.*) At the end of NP Hunter's

report, her assessment was "Pain in limb." (T. 641). She then stated that the pain was

"likely arthritis," but that she would continue to monitor for changes. (T. 642).

A review of NP Rizzo's report, dated June 2, 2011, just three months prior to

PA Hunter's examination, shows that plaintiff ***denied*** "Back pain, Joint pain, Joint

swelling, Limited range of motion, Muscle aches, [or] Muscle weakness." (T. 645).

Thus it appears that plaintiff was not having the "limb" pain in June of 2011. PA

Rizzo's passing reference to arthritis in August was not a diagnosis,[5] and was far from

---

[5] The court would point out that PA Hunter is not an "acceptable medical source" for the purpose of diagnosing or establishing the existence of an impairment. 20 C.F.R. §§ 404.1513; 416.913. Physician Assistants are listed in the section entitled "Other sources." *Id.* §§ 404.1513 (d)(1); 416.913(d)(1). These "other sources" *may* be used to show "the severity of your impairment(s) and how it affects your ability to work. *Id.*

a determination that plaintiff was in any way limited by such an impairment.

Plaintiff's counsel does not cite to any part of the record where arthritis was diagnosed by a physician. Counsel states that at plaintiff's second hearing, he testified that he gets pain in his legs from arthritis and argues that "in light of his morbid obesity, this testimony is credible." (Pl.'s Br. at 18) (citing T. 62). While this might be true if anyone had diagnosed arthritis, there is no such diagnosis in the record, and thus, the ALJ did not err in failing to consider the "combination" of obesity with arthritis.

Plaintiff also argues that he has had two hernia operations, and that he testified at his first hearing that he cannot do heavy lifting or bending based upon the pain caused by the hernias. (Pl.'s Br. at 18) (citing T. 48-49). Once again, plaintiff cites no medical evidence that would support this assertion. In April of *2007*, a medical report indicated that plaintiff had a "*past*" history of umbilical hernia surgery.[6] (T. 332). There is no indication of when the surgery was, or if there was more than one surgery, but clearly it was long before plaintiff's claimed onset date in 2008, and the records do not show that the hernia was symptomatic in 2008. There are no current records of any hernia surgery. In August of 2010, plaintiff went to the emergency room with abdominal pain, but none of the tests confirmed the cause of his pain. (T. 524). On December 8, 2010, plaintiff was diagnosed with an abdominal hernia, but no surgery was required. (T. 577).

---

[6] The report was addressing plaintiff's headache issues and had nothing to do with abdominal pain. (T. 331-32).

Only plaintiff's testimony indicates that he has trouble bending and lifting. (T. 48-49). Plaintiff blames this on his hernias and his "arthritis." Plaintiff argues that because he is obese, this testimony is credible. (Pl.'s Br. at 18). However, as discussed below, credibility is for the ALJ to determine, and plaintiff's assertion that his obesity supports his credibility is only part of the analysis. Thus, the ALJ did not err in failing to properly consider "the combination of impairments."

## IX.  RFC ANALYSIS

### A.  Legal Standards

#### 1.  RFC

In rendering a residual functional capacity (RFC) determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R. §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Id.* (citing, *inter alia*, *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984)). RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations. *Id.* (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, 5:09-CV-1120 (DNH/GHL), 2010 WL 3825629, at *6 (N.D.N.Y. Aug. 17, 2010) (citing SSR 96-8p,

1996 WL 374184, at *7).

### 2. Treating Physician

While a treating physician's opinion is not binding on the Commissioner, the opinion must be given controlling weight when it is well supported by medical findings and not inconsistent with other substantial evidence. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is *not* required to give the opinion controlling weight. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The ALJ must, however, properly analyze the reasons that a report of a treating physician is rejected. *Id.* An ALJ may not arbitrarily substitute his/her own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

### 3. Credibility

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. Mar. 25, 1999)). To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record. *See* 20 C.F.R. §§ 404.1529, 416.929;

*see also Foster v. Callahan*, No. 96-CV-1858 (RSP/GJD), 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ." 20 C.F.R. §§ 404.1529(a), (b); 416.929(a), (b). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which they limit the claimant's capacity to work. 20 C.F.R. §§ 404.1529(c), 416.929 (c). When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

## B. Analysis

In the ALJ's second opinion, she found that plaintiff had the RFC to perform work at all exertional levels, and was able to understand and follow simple directions

and instructions, perform simple tasks, perform complex tasks with supervision, sustain attention and concentration, respond and relate adequately with others, and adapt to changes in the environment. (T. 16). The ALJ found that although plaintiff's psychiatric symptoms were "severe," the evidence did not support a finding that they were consistent with a "disabling" degree of limitation. (*Id.*) The ALJ found that plaintiff's headaches were controlled with medication and not a severe impairment, and that, although somewhat limiting, plaintiff's depression was also controlled with medication.[7](T. 16-18).

Plaintiff contends that the ALJ erred in her consideration of the impact of plaintiff's bipolar disorder on his RFC, arguing that an individual suffering from that disorder will have stable as well as unstable days. (Pl.'s Br. at 21). Plaintiff quotes one sentence from *Matta v. Astrue*, 508 F. App'x 53, 57 (2d Cir. 2013) for this assertion:

> We recognize that a person suffering from bipolar disorder my be vulnerable to "violent mood swings" resulting in "better days and worse days," and that a claimant's ability to on *some* days does not necessarily support the conclusion that he is able to work every day.

*Id.* (citing *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008)).

However, the entire quote from *Matta* does not support plaintiff's analysis. The next sentence of *Matta* reads as follows:

---

[7] On April 3, 2007, Dr. James Boyd and Dr. Abeer Bakhiet Farrag reported that plaintiff's migraines/chronic daily headaches may have been secondary to the overuse of the pain medication "Ultram." (T. 331).

> Nonetheless, substantial evidence in the record supports the
> ALJ's conclusion that this plaintiff, with the proper
> treatment could perform work on a regular and continuing
> basis.

*Id.* The same is true in this case. Although plaintiff has been diagnosed with bipolar

disorder, the ALJ found that plaintiff's "mental health symptoms are very responsive

to medication." (T. 17). The ALJ noted that when plaintiff was hospitalized in

October of 2008 with worsening depression, the discharge summary attributed

plaintiff's condition to noncompliance with prescribed medication. (T. 17, 348).

During his 2008 hospitalization, plaintiff was started on anti-depressants and mood-

stabilizers. At the time of discharge, Dr. Manjit Vohra stated that plaintiff was "on the

meds that really helped him," and that 60 mg of Cymbalta "worked wonders for

chronic pain." (T. 348). The doctor also noted that plaintiff had been seeking opiates

for his pain. (*Id.*)

On January 8, 2009, Gregory Taczko, a Physicians Assistant ("PA") stated that,

recently plaintiff had very little or no depression and had no intent to harm himself or

others. (T. 384). Plaintiff's prior suicidal ideation was caused by the discontinuance

of Ultram. (*Id.*) PA Taczko stated that plaintiff's recent history of bipolar disorder

with anxiety could have been due to too many medications. (T. 385). He was

continued on his medications for depression and anxiety "as this appears extremely

well-controlled." (*Id.*) His mood swings, depression, and anxiety were "purely

situational." (T. 386). While a PA is not an acceptable medical source, the regulations

make clear that these opinions may be used to the extent that they show the severity of

18

the limitations caused by impairments that are diagnosed by acceptable medical sources. *See* 20 C.F.R. §§ 404.1513 (d)(1); 416.913(d)(1) (as stated above, a PA is listed under "other sources," whose opinions may be used to show "the severity of your impairment(s) and how it affects your ability to work").

In December of 2009, plaintiff reported that he was doing better and that he was not particularly symptomatic at the time. (T. 352). His Global Assessment of Functioning ("GAF") score was up to 60,[8] which was the "best in years." (T. 353). On January 29, 2010, treating NP Harry Hill stated that plaintiff's mood was "pretty good" even though he suffered from headaches three to four days out of seven. (T. 350). Plaintiff was still attempting to regulate his medications. (*Id.*) NP Hill prescribed Depakote, Seroquel, and Cymbalta. (T. 350). However, his Depakote levels were lower than the usual therapeutic range. (*Id.*)

On April 9, 2010, Dr. Richard Liotta, a psychologist consultatively examined plaintiff. (T. 359-65). The plaintiff's background information, stated in Dr. Liotta's report, appears to have been a recitation of plaintiff's stated symptoms. (T. 359). Dr. Liotta reviewed NP Hill's records and stated that he did not believe that NP Hill had enough evidence to diagnose bipolar disorder, that plaintiff has "some" anxiety symptoms, and that there was "some" suggestion of Posttraumatic Stress Disorder. (T. 360). Dr. Liotta also reviewed a discharge summary from Champlain Valley

---

[8] The Global Assessment of Functioning Scale (GAF) is a 100 point scale, and 41-50 indicates "serious symptoms," 51-60 indicates "moderate symptoms," and 61-70 indicates "some mild symptoms." DSM-IV-TR at 32-34.

Physicians Hospital ("CVPH"),[9] with an admission date of March 26, 2007 and a discharge date of March 30, 2007. (T. 360). Upon admission, plaintiff told the emergency room that his headache pain was so severe that he "*thought about suicide without any plan*," and he would jump in front of a train if discharged. (T. 360) (emphasis added). He also told emergency room personnel that he had suicidal "thoughts" for the past few years with "no intent." (*Id.*) He ran out of his medication two days prior to the 2007 hospitalization, "which led to his experiencing symptoms of opioid withdrawal." (*Id*.) According to Dr. Liotta, plaintiff denied feeling depressed at the time of his discharge from the 2007 hospitalization.[10]

Dr. Liotta also mentioned an August 31, 2008 hospitalization, with a discharge date of September 4, 2008. (T. 361). The discharge diagnosis was "substance induced mood disorder, opioid dependence, severe, continuous, adjustment disorder with disturbance of mood and conduct, mood disorder not otherwise specified, rule out factitious disorder with psychological and physical symptoms. (*Id.*) Plaintiff's records indicated that he had received over 1000 tablets of Ultram over the past few weeks and had been using them excessively. "It was felt that he provided inconsistent reports about the history of his headaches." He did not have any evidence of major depression, mania, or psychosis, and was stable at discharge. He did not meet the

---

[9] CVPH is in Plattsburg, New York.

[10] The court notes that the discharge summary to which Dr. Liotta refers is not in this administrative record. The medical records begin on April 3, 2007, at which time plaintiff came into the Fletcher Allen Health Care Clinic in Burlington, Vermont, complaining of headaches. (T. 331-32). There is no mention of a hospitalization and discharge from CVHP in Plattsburg four days earlier.

criteria for a major mental illness. (*Id.*)

After discussing plaintiff's history above, Dr. Liotta addressed plaintiff's 2010 status. Plaintiff complained "somewhat" of a headache, and his mood during the evaluation seemed depressed. (T. 363). Dr. Liotta determined that plaintiff clearly had some significant psychiatric issues, and "it would likely be difficult for him to maintain any type of gainful employment due to the combination of his physical and psychiatric symptoms." (T. 364). Dr. Liotta gave plaintiff a GAF score of 49, which indicates some serious symptoms and serious impairment in occupational and social functioning. (T. 364). The ALJ gave this report "little weight" because Dr. Liotta only examined plaintiff once, and his opinion regarding "employability" was not a medical opinion. (T. 17). The ALJ found that his overall assessment was inconsistent with the record as a whole. (*Id.*)

This court agrees. One week later, on April 16, 2010, Dr. Amar Munsiff, a treating physician, stated that plaintiff still had headaches, but they were "stable." (T. 367). Dr. Munsiff also stated that plaintiff's mood disorder was "clinically stable," and that he was quite anxious that the doctor fill out his forms for disability. However, the doctor told plaintiff that he would have to fill out the forms "honestly," and that he found no significant reason that plaintiff was not employed. (T. 368). Dr. Munsiff stated that, despite plaintiff's headaches and mental illness, he was quite functional and attentive and recommended only that plaintiff avoid noisy and dusty environments so as not to trigger the headaches. (*Id.*) Plaintiff was able to focus on the entire thirty minute conversation with the doctor and fifteen to twenty minute

conversation with the nurse without any lapse in concentration. Dr. Munsiff's plan was to begin giving plaintiff Lorvaza and Norvasic, which might help with the headaches. (T. 369). Any conflicts between Dr. Liotta's findings and Dr. Munsiff's findings are for the Commissioner to resolve. Because Dr. Munsiff is a treating physician, albeit a general practitioner, the ALJ was entitled to give his reports more weight.

The ALJ also correctly noted that on August 31, 2011, plaintiff reported to PA Linda Hunter, that he was doing well mentally and emotionally, that he was suicidal "4 years ago," but that since he was put on the proper medications and was seeing a psychiatrist, he was "great." (T. 640). The court notes that on August 15, 2011, plaintiff told NP Scanlan that he was sleeping 7-8 hours per night on the Seroquel, and that he had a "good" summer since their June 2011 session.[11] (T. 21). He reported that he attended both his son's and his ex-wife's weddings during that time. Plaintiff stated that he continued to have headaches, but "he is able to deal with it." (*Id.*) He denied being depressed, rated his anxiety as a "5/10," and was "smiling, alert, and cooperative." (*Id.*) Plaintiff also told NP Scanlan that he had lost 23 pounds in two

---

[11] Plaintiff began seeing NP Scanlan on September 20, 2010, after he saw NP Harry Hill for eight months and after plaintiff had "reached his goals for outpatient therapy" with Steven Keyser, a social worker. (T. 491). NP Scanlan's initial report states that plaintiff told her that he was there "To see if I'm Bipolar and put me as disabled." (*Id.*) Plaintiff became "slightly angry" when NP Scanlan refused to complete plaintiff's disability paperwork at her first meeting with him. NP Scanlan told plaintiff that further assessment was necessary, but he accused his psychiatric and medical providers of "giving him the 'run around' preventing him from being approved for disability." (*Id.*) The court notes that, in her June 6, 2011, NP Scanlan specifically noted that plaintiff "did not bring up his application for disability during this session and seemed pleasant throughout . . . ." (T. 624).

months by increasing his physical activity and decreasing his food intake.[12] (*Id.*) He denied the urge for self-harm, and "his functioning [was] adequate for community living." (*Id.*)

The plaintiff cancelled his August 1, and his September 12, 2011 appointments with NP Scanlon. (T. 620). While it is true that in October of 2011, plaintiff told NP Scanlan that he was having trouble sleeping again, he had run out of medications and had not taken his Depakote or his Cymbalta for "approximately 2 weeks." (T. 619). Plaintiff had "no complaints of headaches or other pain . . . ." (*Id.*) NP Scanlan noted that plaintiff's occupational functioning continued to be low, but this is consistent with the ALJ's finding that plaintiff's condition became worse when he stopped taking his medication. NP Scanlan also noted that plaintiff's "major" concern was that his new granddaughter was born prematurely and was in intensive care at that time. He rated his depression as 4/10 and his anxiety as 5/10. (*Id.*)

The ALJ also discussed a Psychiatric Review Technique and Mental RFC form authored by L. Hoffman, Ph.D. (T. 17, 458-74). Dr. Hoffman found that although plaintiff's activities of daily life are limited by depression "to some extent" and by pain associated with headaches, that despite the limitations, plaintiff was able to

---

[12] During their June 6, 2011 appointment, plaintiff told NP Scanlan that he still had "racing thoughts" at night, but was sleeping better and was looking forward to his son's wedding. (T. 624). He also told NP Scanlan that the thoughts of suicide were "quite a while ago." (*Id.*) Plaintiff also told NP Scanlan that his headaches had decreased and he was no loner using "Tylenol." (T. 624). NP Scanlan stated that plaintiff's "social and occupational functioning [were] adequate for community living and he did not appear to be in any acute psychiatric distress . . . ." (*Id.*) Plaintiff stated that he attributed his weight gain to lack of exercise and soda intake. (*Id.*) NP Scanlan advised plaintiff to decrease his soda intake and increase his physical activity. He apparently took her advice because, as stated above, plaintiff lost 23 pounds in approximately two months.

understand and remember instructions, sustain attention and concentration, respond and relate adequately to others, and adapt to changes. (T. 474)  The ALJ gave great weight to the opinion, finding that the overall assessment was generally well-supported by the record, but did find that plaintiff had moderate, rather than mild limitations in concentration, persistence, or pace and would need supervision when performing tasks that were more complex. (T. 18).

The ALJ gave appropriate weight to plaintiff's treating sources and properly assessed the limitations caused by plaintiff's mental illness as ordered by the Appeals Council.  As the Second Circuit stated in *Matta*, "although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources stated in his decision, he was entitled to weigh all the evidence available to make an RFC finding that was consistent with the record as a whole." 508 F. App'x at 56.

In making her RFC determination, ALJ also found that plaintiff's complaints of pain and other symptoms were only credible to the extent that they were consistent with the stated RFC. (T. 16).  The ALJ is not required to credit a plaintiff's testimony, where as above, it is unsupported by the objective medical evidence. *Lewis v. Colvin*, No. 13-436, 2013 WL 6596942, at *2 (2d Cir. Dec. 17, 2013) (citing *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)).

Plaintiff argues that he had "several suicide attempts" in 2008. (Pl.'s Br. at 22). While there are hospitalizations listed in Dr. Liotta's report from 2007 and 2008, it appears that these hospitalizations occurred because plaintiff stopped taking his medications.  The court also notes that there is no indication in the record of any

hospitalization after an actual suicide attempt.[13]  Plaintiff stated that he had suicidal

thoughts.  In any event, he specifically told his more recent providers, and NP Scanlan

in particular in 2011, that his suicidal thoughts were "4 years ago" and "quite a while

ago." (T. 624, 640).  The only indications that plaintiff actually attempted suicide were

his statements to medical personnel.  The only medical report in 2011, indicating a

worsening of symptoms also states that plaintiff had stopped taking his medication

two weeks prior to the appointment.  He still had headaches, but he was learning to

deal with it.  Thus, the ALJ's credibility finding was supported by substantial

evidence.

     **WHEREFORE,** based on the findings in the above Report, it is hereby

     **RECOMMENDED**, that the decision of the Commissioner be affirmed, and the

plaintiff's complaint **DISMISSED**.

     Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file

written objections to the foregoing report.  Such objections shall be filed with the

Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN 14**

**DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d

---

[13] The court notes that in plaintiff's brief, he cites a case manager's report indicating that plaintiff was an in-patient in 8/08 for depression; in 9/08 for attempted suicide; and for ten days in 10/08 for "attempted suicide." (Pl.'s Br. at 22) (citing T. 582).  First, this reference is on page 583 of the transcript.  Second, a review of the 10/08 discharge summary says absolutely nothing about an attempted suicide. (T. 348).  In the discharge summary, which this court has discussed above, Dr. Vohra states that plaintiff "had depression worsening due to noncompliance with medication." (*Id.*)  It seems unlikely that the doctor would not have mentioned that plaintiff attempted suicide before admission.  There are other references to plaintiff's "suicidal ideation," including a statement by plaintiff to social worker Dan Dupree that he attempted suicide twice in August of 2008 and then sought help at CVPH. (T. 600).

85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: January 7, 2014

Hon. Andrew T. Baxter
U.S. Magistrate Judge